SO ORDERED.

Dated: September 19, 2016

Edward P. Ballinger Jr., Bankruptcy Judge
_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

MINUTE ENTRY/ORDER

FOR MATTER TAKEN UNDER ADVISEMENT

| | |
|---|---|
| Bankruptcy Judge: | Hon. Eddward P. Ballinger, Jr. |
| Case Name: | Mortgages Ltd. - Chapter 11 |
| Case No.: | 2:08-bk-07465-EPB |
| Adversary Name: | ML Manager, LLC, et al. v. William L. Hawkins as Trustee of the Cornerstone Realty and Development, Inc. Defined Benefit Plan and Trust, dated January 1, 2004, et al. |
| Adversary Number: | 2:10-ap-00430-EPB (consol.with adversary number 2:10-ap-00717-EPB) |
| Subject of Matter: | Trial |
| Date Matter Taken Under Advisement: | June 29, 2016 |
| Date Matter Ruled Upon: | September 19, 2016 |

## Introduction

The issues before the Court are whether the Rev Op Group ("ROG") defendants[1] in this adversary case are bound to an irrevocable agency agreement with Plaintiff ML Manager, LLC

---

[1] The term Rev Op Group refers collectively to L.L.J. Investments LLC ("LLJ"), Cornerstone Realty and Development, Inc. Defined Benefit Plan and Trust ("Cornerstone DBP"), AJ Chandler 25 Acres, L.L.C. ("AJ Chandler"), Bear Tooth Mountain Holdings, L.L.P. ("Bear Tooth"), Brett M. McFadden ("McFadden"), Cornerstone

1

("ML Manager") and, if bound, the extent of ML Manager's agency authority. A trial was held over the course of four days, from June 7-10, 2016, and the parties submitted post-trial memoranda on June 29, 2016.

**Factual Background**

The facts regarding this bankruptcy and adversary have been set forth on numerous occasions not only by the parties, but also in several opinions by the Ninth Circuit Court of Appeals. For the sake of judicial efficiency, this Court appropriates, in part, the history of this case from those appellate decisions and the parties' Joint Pretrial Statement.

ML Manager's predecessor in interest, Mortgages Ltd., was a private lender funding real estate investments in Arizona. Its borrowers executed promissory notes in favor of Mortgages Ltd. and provided various forms of security, including real property evidenced by deeds of trust, assignments of rent and, in some cases, personal guarantees. Mortgages Ltd. raised monies to fund the loans by selling interests in the loans to investors who received fractional interests in the notes and trust deeds. The parties describe these partial ownership interests generally as "pass-through" investments, meaning the investors acquired a direct fractional interest in the loan documents. Each direct fractional interest was also referred to as a "participation." Unlike other investment vehicles in which investors received equity in the lender, when a Mortgages Ltd. borrower defaulted and its real property collateral was foreclosed upon, those holding participations became part owners of the realty as tenants in common with the others who had

---

Realty and Development, Inc. ("Cornerstone Inc."), James C. Schneck Revocable Trust ("Schneck"), Louis B. Murphey ("Murphey"), Michael Johnson Investments II, L.L.C. ("Johnson"), Morley Rosenfeld M.D. P.C. Restated Profit Sharing Plan ("Rosenfeld"), Pueblo Sereno Mobile Home Park, L.L.C. ("Pueblo Sereno"), Queen Creek XVIII, L.L.C. ("Queen Creek"), Lonnie Joel Krueger Family Trust ("Krueger"), and William L. Hawkins Family L.L.P. ("Hawkins Family L.L.P."). The ROG defendants agreed in the Joint Pretrial Statement that AJ Chandler, Bear Tooth, Johnson, Rosenfeld and the Hawkins Family L.L.P. shall be bound by whatever final determinations are made with respect to Cornerstone, Inc.

invested in the same loan. Mortgages Ltd. acted as the servicing agent not only for its loans, but also for the properties acquired due to loan defaults.

Mortgages Ltd. sold its pass-through investments through numerous investment programs described in general terms in a Private Offering Memorandum ("POM"). The ROG participated in a loan program called the Revolving Opportunity Loan Program ("Rev Op Program"), in which each investor agreed to purchase a fractional interest in a Mortgages Ltd. loan, at least temporarily. Rev Op Program investors granted Mortgages Ltd. the right to repurchase the investor's fractional interest at a contractually specified price at any time during the contract period. Additionally, Mortgages Ltd. was obligated to repurchase each interest for a specified price at the end of the contract term if the borrower had not fully repaid the loan. Rev Op Program investments typically matured in 90 to 120 days. These repurchase rights distinguished this investment program from other programs offered by Mortgages Ltd.

In 2008, Mortgages Ltd. commenced a Chapter 7 bankruptcy proceeding (subsequently converted to a Chapter 11). Its confirmed bankruptcy plan provided for the creation of various limited liability companies referred to as the "Loan LLCs." The Loan LLCs were created to hold the Mortgages Ltd. loans and loan documents associated with each particular loan. ML Manager was created to manage and operate the Loan LLCs. Investors were given the option of exchanging their existing participations for membership interests in the new Loan LLCs.

Members of the ROG elected not to transfer their participation interests to the Loan LLCs, which meant under the terms of the bankruptcy plan that they continued to hold their fractional interests according to the terms of their pre-bankruptcy investment agreements:

> Any Pass-Through Investor that does not transfer its fractional interests into a
> Loan LLC will receive its distribution pursuant to the existing Agency Agreement

3

> and other contracts which may be assigned to the ML Manager LLC. Before such distributions are made, Pass-Through Investors who retain their fractional interests in the ML Loans shall be assessed their proportionate share of costs and expenses of serving and collecting the ML Loans in a fair, equitable and nondiscriminatory manner and shall be reimbursed in the same manner as the other Investors.

Amended Plan, section 4.13, docket 1532 and Order Confirming Amended Plan, section U.2., docket 1755. Further, the plan provided that, at the option of the plan proponent, the contracts between Mortgages Ltd. and the pass-through investors who elected not to transfer their ownership interests to the Loan LLCs could be transferred and assigned to ML Manager.

Since confirmation, ML Manager has sought to sell some of the loans in its portfolio. The ROG objected to many of these sales on the ground that ML Manager could not dispose of the properties without the ROG's consent. ML Manager disagreed, asserting that the ROG was bound by the terms of various pre-bankruptcy agreements designating Mortgages Ltd. as the ROG's agent and, in accordance with the provisions of the reorganization plan, ML Manager succeeded to Mortgages Ltd.'s agency role. This dispute eventually led ML Manager to file this adversary proceeding seeking declaratory judgment as follows:

> 1. That the ROG members entered into and remain bound by valid agreements designating Mortgages Ltd. as its agent;
>
> 2. That the agreements granted Mortgages Ltd. sole authority to take specific actions with respect to the properties with or without the ROG's consent; and
>
> 3. That the agreements, and therefore the agency authority, were properly transferred to ML Manager post-confirmation.

The ROG counterclaimed, seeking an accounting from ML Manager and declaratory judgment that the ROG validly revoked any agency authority if such authority ever existed.

Subsequently, the ROG filed a motion for partial summary judgment on its declaratory judgment counterclaim. Solely for purposes of the motion for summary judgment, the ROG assumed agency authority existed and argued it had validly revoked such authority. On May 26, 2010, the bankruptcy court denied the ROG's motion for summary judgment, concluding that the agency authority was coupled with an interest and irrevocable. Additionally, the court held that the agency authority was not decoupled by the assignment to ML Manager. The court indicated that whether the assignment to ML Manager was valid was an issue still to be determined.

The day before the bankruptcy court issued this ruling, ML Manager filed its own motion for judgment on the pleadings on its countervailing request for declaratory judgment. The legal arguments presented overlapped, in part, with those raised in the ROG's partial motion for summary judgment. Additionally, the motion for judgment on the pleadings raised questions as to whether the agency agreements were executed, whether the agency agreements were incorporated by reference into other executed investor agreements, the scope of the agency agreements, and whether discretion was withheld by some investors. At the hearing on the motion, the court granted the parties time for additional briefing on whether the plausibility standard, outlined in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), governed the denials made by the ROG in their answers to the allegations in ML Manager's complaint. After the additional briefing, the court issued its decision concluding that the ROG's denials were implausible and that the ROG had executed the respective agency agreements. The court entered declaratory judgment in favor of ML Manager on the enforceability of the agency agreements and dismissed the ROG's counterclaims.

5

The ROG appealed, and the matter made its way to the Ninth Circuit Court of Appeals, which reversed and remanded the case, concluding that the bankruptcy court had failed to analyze the ROG's denials in the answers under either the required Rule 11 or Rule 12(f) standards:

> Perhaps Rev Op Group's denials are implausible. Perhaps the denials should be deemed a sham under Rule 11. But the bankruptcy court did not find that the denials were made in bad faith, nor were the denials liable to be stricken under Rule 12(f). We reiterate that in the absence of any such findings, "factual allegations in the complaint (or answer) must be tested through normal mechanisms for adjudicating the merits." We reverse the bankruptcy court's determination in its Declaratory Judgment that each member of the Rev Op Group had executed the agency agreements, and was "to be bound to" those agreements.

*In re Mortgages Ltd.,* 771 F.3d 623, 632 (9th Cir. 2014)(citations omitted). With the matter back before this Court, this matter proceeded to trial, after a few unsuccessful summary judgment detours.

### The Documents

After years of litigation, both ML Manager and the ROG agree that their dispute can be resolved by answering two questions: 1. Is ML Manager the ROG's agent? and 2. If an agency relationship exists, what is its scope?[2] To resolve these questions, the Court must determine which documents govern the relationship between each ROG investor and Mortgages Ltd./ML Manager. In addition, the Court must determine whether parol evidence is admissible to interpret these materials, particularly with respect to the ROG's claim that some of its members

---

[2] A third issue at the commencement of the trial was whether Mortgages Ltd. properly transferred and assigned the contracts to ML Manager post-confirmation. At trial and in its pre-trial memorandum, the ROG conceded that Mortgages Ltd. did assign the contracts to ML Manager and that ML Manager stepped into the shoes of Mortgages Ltd. Rev Op Defendants' Pre-Trial Memorandum, docket 335, p. 5 and Transcript of June 7, 2016, hearing, docket 352, p. 16.

Case 2:10-ap-00430-EPB    Doc 362    Filed 09/19/16    Entered 09/20/16 10:19:09    Desc
Main Document    Page 6 of 19

withheld, revoked or modified the grant of authority set forth in documents upon which ML Manager relies for its broad agency authority.

ML Manager believes the following documents establish that Mortgages Ltd. was granted sole discretion to act on behalf of the ROG investors in managing properties and/or loans, including the authority to sell the properties securing defaulted loans upon terms the agent deems appropriate:

1. <u>The Form Agency Agreement attached to the July 10, 2006, Private Offering Memorandum</u>

The parties agree Mortgages Ltd. issued offering memoranda to potential investors describing its various investment programs, their respective terms, potential risks and obligations. They also agree each ROG member invested in accordance with the terms of one such memorandum. ML Manager claims the ROG invested pursuant to the private offering memoranda dated July 10, 2006 ("POM"), which subjected each investor to the terms contained in an attached Form Agency Agreement. The ROG disputes that all its members invested pursuant to the July 10, 2006, POM and points out that ML Manager has not produced any version of the attached Form Agency Agreement executed by or on behalf of any ROG defendant.

ML Manager relies on the following paragraph contained within the POM entitled Agency Agreement:

> The Company and each Participation holder will be a party to an Agency Agreement, substantially in the form of Exhibit A to this Memorandum, that provides for the Company to administer Loans on behalf of the Participation holders. The Company will act as the agent for the Participation holders under the Agency Agreement, as the beneficiary under the deeds of trust on the underlying properties, and will have certain powers and duties including administering the Loans on behalf of the Participation holders.

7

Trial Exhibit 8, p. 8.  Exhibit A to the POM – the Form Agency Agreement – provides in pertinent part as follows:

> Participant appoints Agent to act as Participant's agent with regard to the Loans and the Loan Documents (as defined below). . . .  Participant authorizes Agent to perform all of the tasks described in this Agreement on Participant's behalf, at Agent's sole discretion.  Participant irrevocably appoints, with full power of substitution, Agent as its true and lawful attorney-in-fact, with authority to sign and endorse all documents and perform any other task to effectuate the intent of this Agreement.  This power is a power coupled with an interest, and such power is irrevocable and shall remain in full force and effect until renounced by Agent.

Trial Exhibit 8, p. 52 or Trial Exhibit 10, p. 1.  Among the powers granted to the agent under this provision are responsibility for account servicing, collection, compensation, and sale of interests.  In addition, the Form Agency Agreement provides that this agreement sets forth the entire agreement and understanding of the parties and is to be read consistently with the other relevant documents.  Trial Exhibit 10, p. 8, ¶ 7(d).  Modification and amendment of the agency relationship requires a written memorialization.  *Id*. at ¶ 7(f).  Paragraph 7(k) also permits the agent to sign the agreement on behalf of the investment participant as the investor's attorney-in-fact.  *Id.* at p. 9, ¶ 7(k).

2. The Revolving Opportunity Loan Program Purchase Agreement ("Rev Op Agreement")

Each ROG defendant participated in the Revolving Opportunity Loan Program ("Rev Op Program"), which permitted purchase of fractional interests in Mortgages Ltd. collateralized loans and which was memorialized by a Revolving Loan Opportunity Agreement ("Rev Op Agreement").  Unfortunately, each Rev Op Agreement was not identical.  For example, ML Manager acknowledges that the Rev Op Agreement signed by ROG member McFadden does not contain any agency authority language.  Additionally, investor Krueger presented a Rev Op

8

Agreement that differs from the one produced by ML Manager in that certain authority is withheld by Krueger from Mortgages Ltd. and one paragraph stricken in Krueger's version, but not in ML Manager's version. Most ROG investors, however, signed a version of the Rev Op Agreement containing provisions like this one:

> 8.2 Representations and Warranties of Investor. Investor represents and warrants to Company [Mortgages Ltd.] as follows:
>
> *                              *                              *
>
> (d) Acknowledges that Investor is fully familiar with [Rev Op] Program and with Company and its business, affairs, operating policies, and prospects and has had access to any and all material information, including all documents, records, and books pertaining to Company, that Investor deems necessary or appropriate to enable Investor to make an investment decision to participate in the Program and purchase Participations.
>
> (e) Acknowledges that the Investor has been encouraged to rely upon the advice of Investor's legal counsel, accountants, and other financial advisors with respect to the participation in the Program and the purchase of Participations.
>
> (f) Represents and warrants that Investor, in determining to participate in the Program and purchase Participations, has relied solely upon this Agreement, the Memorandum [POM], and the advice of Investor's legal counsel, accountants, and other financial advisors and has been offered the opportunity to ask such questions and inspect such documents concerning the Company and its business and affairs and the Program as Investor has requested so as to understand more fully the Program and the nature of the investment and to verify the accuracy of the information supplied.
>
> *                              *                              *
>
> (p) Represents and warrants that neither Company, Mortgages Ltd. Securities, L.L.C. ("MLS"), an affiliate of Company, nor anyone purportedly acting on behalf of either of them has made any representations or warranties respecting the Program or the business, affairs, financial condition, plans, or prospects of the Company except those contained in the Memorandum [POM] nor has Investor relied on any representations or warranties in the belief that they were made on behalf of any of the foregoing, nor has Investor relied on the absence of any such representations or warranties in reaching the decision to participate in the Program or purchase Participations.

9

\*             \*             \*

10.2 Entire Agreement. This Agreement, together with the Loan Assignment Documents and the Reassignment and Release Documents, contain the entire agreement between the parties with regard to the subject matter hereof. There are no representations, promises, warranties, understandings, or agreements, expressed or implied, oral or otherwise, in relation thereto, except those expressly referred to or set forth herein. Each party acknowledges that the execution and delivery of this Agreement is its free and voluntary act and deed, and that said execution and delivery have not been induced by, nor done in reliance upon, any representations, promises, warranties, understandings, or agreements made by the other party, its agents, officers, employees, or representatives.

l0.3 Agreements in Writing. No promise, representation, warranty, or agreement made subsequent to the execution and delivery of this Agreement by either party hereto, and no revocation, partial or otherwise, or change, amendment, or addition to or alteration or modification of this Agreement shall be valid unless the same shall be in writing signed by all parties hereto.

\*             \*             \*

Section 11. Adoption of the Agreements.

11.1 Power of Attorney. By executing this Agreement, Investor accepts and agrees to be bound by the Agency Agreement, the Loan Assignment Documents, and the Reassignment and Release Documents. Investor further hereby irrevocably constitutes and appoints the Company, with full power of substitution, as Investor's true and lawful attorney and agent, with full power and authority in the Investor's name, place, and stead, to make, execute, swear to, acknowledge, deliver, file, and record the following:

(a) The Agency Agreement, the Loan Assignment Documents, and the Reassignment and Documents, and any amendments thereto;

(b) All certificates, instruments, documents, and other papers and amendments thereto that may from time to time be required under the laws of the United States of America, the state of Arizona, any other state or jurisdiction, or required by any political subdivision or agency of any of the foregoing or otherwise, or which Company deems appropriate or necessary to carry on the objects and intent of this Agreement and to administer the Revolving Opportunity Loan Program as contemplated by this Agreement;

10

This power of attorney granted hereby shall be deemed to be a power coupled with an interest, shall survive the death, legal incapacity [sic] bankruptcy, merger, sale, dissolution, termination, or other fundamental change of Investor, and shall survive the delivery of an assignment by Investor of all or any portion of Investor's Investments.

*   *   *

12.4 Binding Agreement. This Agreement shall be binding upon the parties hereto and may not be assigned by either party.

Trial Exhibit 16, pp. 4-9.

3. <u>New Investor Subscription Agreement ("NISA")/Existing Investor Account Agreement ("EIAA")</u>

The parties refer to the NISA and EIAA collectively as the Subscription Agreements. Each Subscription Agreement contains language either identical to, or very similar to, the following in reference to the agency agreements:

4. Adoption of the Agency Agreement. By executing this Agreement, the undersigned accepts and agrees to be bound by the Agency Agreement in the form of an exhibit to the Memorandum [POM] or as otherwise furnished to the undersigned. The undersigned further hereby irrevocably constitutes and appoints Mortgages Ltd., with full power of substitution, as the undersigned's true and lawful attorney and agent, with full power and authority in the undersigned's name, place, and stead, to make, execute, swear to, acknowledge, deliver, file, and record the following:

(a) The Agency Agreement and amendments thereto;

*   *   *

(c) All certificates, instruments, documents, and other papers and amendments thereto that may from time to time be required under the laws of the United States of America, the state of Arizona, any other state or jurisdiction, or required by any political subdivision or agency of any of the foregoing or otherwise, or which Mortgages Ltd. deems appropriate or necessary to carry on the objects and intent of the Programs and the purchase of Participations;

(d) All conveyances and other instruments that Mortgages Ltd. deems appropriate to effect the transfer of Participations.

11

(e) Unless authorization is withheld by so indicating below or in another written document to Mortgage [sic] Ltd. and MLS, the undersigned hereby authorizes Mortgages Ltd. to be named as the lender/payee/beneficiary as agent for the undersigned in the deed of trust or deeds of trust or mortgage or mortgages securing the Loan or Loans and other documentation relating to the Loans.

_____ _____
Authorization granted            Authorization withheld

This power of attorney granted hereby shall be deemed to be a power coupled with an interest, shall survive the death, legal incapacity [sic] bankruptcy, merger, sale, dissolution, termination, or other fundamental change of the undersigned, and shall survive the delivery of an assignment by the undersigned of all or any portion of the undersigned's Participations or any interest therein ….

\*           \*           \*

7. Grant of Discretion. Until revoked at any time in writing, the undersigned hereby grants discretion to Mortgages Ltd., in its sole discretion, to select for purchase and sale the Loan or Loans with respect to which the undersigned acquires Participations. Without limiting the foregoing, the undersigned understands that this grant of discretion will give Mortgages Ltd. the authority, in its sole discretion, to make various determinations and take various actions with Loans with respect to Participations to be acquired, acquired [sic], or sold by the undersigned.

_____ _____
Discretion granted               Discretion withheld

Trial Exhibit 17, pp. 5-6.

The ROG defendants challenge the validity of several versions of the agreements ML Manager provides, arguing that some appear to have been altered without the investor's knowledge or consent. Additionally, the ROG contends that several investors withheld agency authority and/or discretion such that no agency authority or power of attorney was ever granted to Mortgages Ltd.

## Parol Evidence

One preliminary legal issue raised in this case is the extent parol evidence is admissible to interpret the contracts at issue. Parol evidence is inadmissible to vary or contradict a written contract between parties where the contract is a complete and accurate integration of the parties' agreement. *Taylor v. State Farm Mut. Auto. Ins. Co.,* 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993)(citing 3 Arthur L. Corbin, Corbin on Contracts § 573, at 357 (1960) ( "Corbin"); *Rental Dev. Corp. v. Rubenstein Const. Co.,* 96 Ariz. 133, 136, 393 P.2d 144, 146 (1964)). Prior understandings, negotiations, and subsequent conduct may be admissible, however, to assist in interpreting the parties' intentions. *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 393, 682 P.2d 388, 398 (1984).

Courts generally take one of two analytical approaches to determining when parol evidence is admissible. The restrictive, plain meaning approach prohibits consideration of parol evidence where the contract is plain and unambiguous on its face. *See Taylor,* 175 Ariz. at 152-53, 854 P.2d at 1138-39. Where the contract's language is plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature. *Id*. The less restrictive approach permits courts to consider "all of the proffered evidence to determine its relevance to the parties' intent." *Id.* As long as the contract language is "reasonably susceptible" to the interpretation asserted by its proponent and not contradictory to the language in the contract, parol evidence will be admissible. *Id.* at 154, 854 P.2d at 1140.

> According to Corbin, the proper analysis has two steps. First, the court *considers* the evidence that is alleged to determine the extent of integration, illuminate the meaning of the contract language, or demonstrate the parties' intent. The court's function at this stage is to eliminate the evidence that has no probative value in

13

> determining the parties' intent. The second step involves "finalizing" the court's understanding of the contract. Here, the parol evidence rule applies and *precludes admission* of the extrinsic evidence that would vary or contradict the meaning of the written words.

*Id.* at 153, 854 P.2d at 1139 (citations admitted and emphasis in original).

Arizona follows this less restrictive view.[3] As such, this Court need not make a preliminary finding of ambiguity before considering extrinsic evidence offered by the parties. Rather, the question for the Court is whether the extrinsic evidence being offered simply aids in interpreting the intent of the parties, as opposed to contradicting the meaning of the contract's terms, and whether the contract language at issue is reasonably susceptible to the interpretation offered by the party seeking to admit the extrinsic evidence.

The Court permitted ROG witnesses to testify regarding their understanding (or at times lack of any understanding) regarding the relevant ROG/Mortgages Ltd. relationship. However, this testimony does not permit the Court to ignore the numerous memorializations and acknowledgements of the broad agency powers granted to Mortgages Ltd. – the powers now held by ML Manager – because to do so would violate the legal limits on use of parol evidence. ML Manager's agency powers are easily determined by reference to the materials described above.

The evidence presented by the ROG to argue against enforcement of the parties' written agreements is rejected for a second reason: It is not credible. The Court is sympathetic to the significant financial losses suffered by the honest investors comprising the ROG. They have the right to expect redress from Mortgages Ltd. and its successor. There is no need to embarrass them with record citation to the defects in their evidence. It is enough to point out that at trial

---

[3] The parties agree that Arizona law governs in this case.

Case 2:10-ap-00430-EPB    Doc 362    Filed 09/19/16    Entered 09/20/16 10:19:09    Desc
Main Document    Page 14 of 19

their testimony was, at times, evasive, contradictory, implausible and not believable. During ML Manager's case in chief, some financially sophisticated ROG members purported to be strikingly naïve about key terms governing their investment relationships with Mortgages Ltd. But, when it came time to present the ROG's evidence, these same members appeared much more certain regarding the powers granted to ML Manager's predecessor.

Even if this Court accepted some of the ROG representations regarding Mortgage Ltd.'s operations, the documentary evidence clearly establishes that the only plausible interpretation of the ROG/Mortgages Ltd. relationship is that while it may be true that Mortgages Ltd. promised each investor would receive its promised return – by way of borrower performance or Mortgages Ltd. investment repurchase – the governing written agreements show that investors granted the company broad agency powers with respect to loan portfolio administration. Each ROG member was entitled to prevent prospective use of loan repayment proceeds for new endeavors. But, once the ROG acquired a participation, its members acknowledged that Mortgages Ltd. could act on behalf of all investors in connection with dealing with borrowers and liquidating loan collateral. There is no credible evidence establishing that Mortgages Ltd. created (or that the experienced ROG members invested in) a loan program that granted any individual stakeholder asset management veto power over transactions involving multi-million dollar investments by other participants.

Special attention is required regarding the allegations of ROG members McFadden and Krueger, both of whom admitted receiving and signing some, although not all, of the documents relied on by ML Manager. In particular, McFadden argued his Rev Op Agreement did not contain any agency language. However, McFadden admitted signing the EIAA offered as

Exhibit 12 by ML Manager. His EIAA, like the others, expressly provides that the investor agrees to be bound by a form agency agreement attached to the July 10, 2016, POM. His claim he never received the POM, if true, does not change the fact that his EIAA contained the same paragraphs 4 and 6 as cited in section 3 of this decision, New Investor Subscription Agreement ("NISA")/Existing Investor Account Agreement ("EIAA"), regarding the grant of agency authority and discretion to Mortgages Ltd. Trial Exhibit 12. His testimony that he did not know he was agreeing to such agency authority because he did not read the document before signing it does not alter the fact that he, in fact, signed the document containing a clear, express grant of agency authority.

With respect to Krueger, the parties offered conflicting Rev Op Agreements. ML Manager offered Exhibit 24, which is a fully executed copy of a Rev Op Agreement dated September 25, 2007, with signatures of both Krueger (on behalf of the Lonnie Joel Krueger Family Trust), and Mortgages Ltd.'s owner, Scott Coles. Krueger acknowledged signing the last page of this document and admitted that the fax number at the top of the document is a fax number belonging to his businesses. He makes three arguments to challenge the authenticity of this document. First, he argues that pages 1-9 attached to the signature page are not the pages he included with his signature page to Mortgages Ltd. Second, he denies having faxed the Rev Op Agreement to Mortgages Ltd. Third, he contends that the version of the Rev Op Agreement he executed is the one the ROG provides at Exhibit 217.

Exhibit 217 mirrors ML Manager's Exhibit 24, but for three differences. First, this agreement is only executed by Krueger: There is no signature on behalf of Mortgages Ltd. Second, Krueger has stricken two provisions in this version relating to the grant of a power of

16

attorney to Mortgages Ltd. Third, there is no indication of any facsimile transmission. Upon the Court's review of the documents, and considering the testimony at trial, the Court concludes that Exhibit 24 is the governing agreement.

## Agency with an Interest

Another argument proffered by the ROG is that even if agency authority was granted to Mortgages Ltd., the grant of agency was revocable and, in fact, was effectively revoked by the ROG defendants. The Court disagrees for two reasons. First, the provisions referring to agency authority in the Form Agency Agreement, Subscription Agreements and Rev Op Agreements expressly state that the agency authority is coupled with an interest and irrevocable. Second, even in the absence of such language, Arizona law provides that if the power or agency is coupled with an interest in the subject matter of the agency, the agency is irrevocable. *See Phoenix Title & Trust Co. v. Grimes*, 101 Ariz. 182, 184, 416 P.2d 979, 981 (1966).[4] Unlike a general power of attorney, this "type of power is not merely an interest in the exercise of the power, but an interest in the property over which the power operates. A power coupled with an interest survives the person giving it and is irrevocable." *In re Indenture of Trust Dated January 13, 1964,* 235 Ariz. 40, 50, 326 P.2d 307, 317 (App. 2014)(citations omitted).

In *Phoenix Title*, plaintiff located a parcel of raw land and organized a joint venture to "purchase, develop, subdivide and resell the land" for the mutual benefit of a group of investors. *Phoenix Title*, 101 Ariz. at 183, 416 P.2d at 980. The parties entered into several agreements, one of which provided plaintiff the sole right to "advertise, promote, develop and sell the lots" in which he also had a percentage ownership interest. *Id*. Plaintiff would receive a commission

---

[4] The Ninth Circuit cited this legal principle without criticism in *In re Mortgages Ltd*., 771 F.3d 623, 625 (9th Cir. 2014).

17

from the sales proceeds. The court concluded that plaintiff's power was coupled with an interest. Plaintiff did not simply have an interest in the commission for marketing and selling the properties. Plaintiff's interest was coupled with an ownership interest in the thing – the property itself over which he exercised authority. As such, plaintiff's death did not terminate the agency relationship: It was irrevocable.

> By the phrase "coupled with an interest," is not meant an interest in the exercise of the power, but an interest in the property on which the power is to operate.

*Id.* at 184, 416 P.2d at 981 (quoting *Taylor v. Burns*, 203 U.S. 120, 27 S.Ct. 40, 51 L.Ed. 116 (1906)).

The interest of Mortgages Ltd. (and now ML Manager) similarly is not simply an interest in the power itself, but is an interest in the loans upon which the power was to operate. As Judge Haines noted, Mortgages Ltd. retained an interest in the interest spread and default interest, providing it with an interest in the loans themselves. Transcript of May 26, 2010, hearing, docket 129, pp. 59-60. As was stated in *Phoenix Title*, the plaintiff in that case was so "instrumental in creating the transaction, and his agency was such an inseparable part of the transaction, that the threads of the agreements cannot be torn from the warp and woof of the transaction itself." *Phoenix Title*, 101 Ariz. at 184, 416 P.2d at 981.

Likewise, Mortgages Ltd. was instrumental in creating this transaction and the agency authority was an inseparable part of the transaction, as the investors were investing, in essence, in Mortgages Ltd.'s ability to manage these loans for the investors. Additionally, the Court agrees with Judge Haines' conclusion that the confirmed plan did not decouple those interests. Transcript of May 26, 2010, hearing, docket 129, p. 60. The plan provided that ML Manager

18

stepped into Mortgages Ltd.'s shoes and continued to manage the loans for the benefit of the investors.

Based upon the foregoing, the Court finds and concludes that ML Manager possesses a non-revocable agency power granting it authority to manage its investment portfolios to further the best interests of all investors in a manner consistent with duties imposed on it both by its assumed contractual duties and the provisions of confirmed bankruptcy plan. Counsel for ML Manager shall prepare and upload a form of Order that is consistent with the memorandum decision.